IN THE MATTER OF THE ESTATE OF HENRY P. PULLING, DECEASED. APPEAL OF ADA M. LATHROP ET AL.

[See 85 Mich. 34; 88 Id. 387.]

*Husband and wife—Antenuptial contract—Dower—Distributive share of personalty.*

1. An antenuptial agreement by which a woman, in consideration of $5 and of love and affection, releases all right of dower which, upon the death of her intended husband, she as his widow may have in his estate, is not sufficient to bar her dower therein.

2. Five days before her marriage, a woman signed an agreement by which, in consideration of the sum of $5 and of love and affection, she released all of her prospective dower rights and her right to share in the personalty in the estate of her intended husband, who, on the day of the marriage, signed a paper stating that the purpose of the antenuptial agreement was to avoid delay or embarrassment in the final settlement of his estate, which the existence of such dower right might occasion, and that he expected to provide for the future of his intended wife in a manner consistent with his financial ability, and that she confided in him fully in the matter. Twenty-one days after their marriage the husband executed a quitclaim deed to his wife of a life-estate in his homestead, and a bill of sale of a like interest in the household furniture therein, both of which papers were left in *escrow*, to be delivered to his wife upon his death. About two months later the husband died, leaving an estate valued at $120,000, one-third of which was real estate and the remainder personal property, but made no provision for his wife in his will, which was executed several years prior to the marriage. The widow was, however, allowed her distributive share of the personal estate by the probate court, which order is affirmed.

Error to Wayne. (Reilly, J.) Submitted on briefs July 1, 1892. Decided October 4, 1892.

Appeal by heirs from an order of the circuit court, affirming the order of the probate court, allowing the

widow her share in the personal estate of the deceased. Affirmed. The facts are stated in the opinion, and in 85 Mich. 34.

*Charles B. Lothrop*, for appellants.

*Fraser & Gates*, for appellee.

LONG, J. On July 15, 1891, the probate court of Wayne county made an order assigning the personal estate of Henry P. Pulling, deceased. Jeane W. Pulling, the widow, was given the household furniture, $200 of other personal property, and one-third of the rest of the personal estate, until such sum should amount to $5,000, and one-half of the remainder of such one-third. The balance of the estate was paid to the appellants here, who are the children by a former marriage, and heirs at law of the deceased. From this order an appeal was taken by the heirs at law to the circuit court for Wayne county, and, upon a hearing there, the decree of distribution was affirmed by direction of the court. The heirs at law bring the case here on error.

It appears that Dr. Pulling died in the city of Detroit on July 15, 1890. He was possessed at the time of his death of about $88,000 of personal estate, including land contracts, and $40,000 of real estate, exclusive of his homestead in Detroit. At the time of his marriage with Jeane W. Pulling, Dr. Pulling was about 75 years of age, and his wife about 40. The marriage took place April 26, 1890. Prior to the marriage the deceased obtained from Jeane W. the agreements which are set out in *Pulling v. Durfee*, 85 Mich. 34. After the marriage, Dr. Pulling executed a deed conveying to his wife a life interest in the homestead occupied by him in Detroit, valued at $10,000; and he also gave her a bill of sale for life of the furniture therein, valued at about $1,500. Mrs. Pulling occupies the homestead. Deceased left a will, which was admitted to probate, but no provision whatever was made by

it for the widow. The contention here on the part of the heirs is that these antenuptial agreements are valid and binding upon the widow, and that, by such agreements, she has released all claims upon the estate of her husband. The same claim was made in *Pulling v. Durfee, supra,* and that by the terms of these agreements she was not entitled to an allowance pending the settlement of the estate. We granted a *mandamus* in that case, directing the judge of probate to make proper allowance to her.

The sole consideration for the agreement, by which it is claimed the widow has barred her right, is the sum of $5 and love and affection. Were the agreements signed by the widow the sole evidence of what the understanding between the parties actually was, there might be some force in the contention; but on the very day of the marriage (April 26, 1890) the deceased made a writing, under his hand, which throws some light upon the transaction, and shows that the whole agreement and understanding between the parties was not confined to the papers signed by Mrs. Pulling. It not only shows that fact, but also the motives which actuated the parties in making any agreement whatever. It is evident that had Dr. Pulling lived for any length of time after the marriage he would have made some other and better provision for his widow, and that it was his intent to do so. The letters of Dr. Pulling, which are in evidence in the case, show that he had considered the question of his marriage with Mrs. Pulling for a considerable length of time, and that it was a constant source of trouble to him as to how his daughters might view it. He apparently had a high regard for their judgment, and desired so to conduct his affairs that they could attach no blame to him; but at the same time he desired, as he expressed in the writing left by him, to make ample provision for his widow at his death. As one step in that direction,

he gave her a life-estate in the homestead and the furniture. He, of course, recognized the fact that, in the event of his death, there would be no income from that by which she could have any support whatever; but, as he said, "he expected to provide for her future consistent with his ability in a financial way." He asserts that it was understood between himself and wife that he should .do so.

It is apparent, from all the writings, that the agreements signed by the wife were intended to allay any feeling which his daughters might have against the marriage, and it is evident that it never was understood between them that the wife was not to share in the estate.

The antenuptial writings, if they are to have the force contended for, not only cut the widow off from all participation in the personal estate, but also operate to bar her right of dower. How. Stat. § 5746, provides how a woman may be barred of her dower. It reads:

" A woman may also be barred of her dower in all the lands of her husband, by a jointure settled on her with her assent before the marriage, provided such jointure consists of a freehold estate in lands for the life of the wife at least, to take effect in possession or profit immediately on the death of her husband."

No such jointure was settled on Mrs. Pulling by these agreements, the only actual consideration paid to bar her dower in $40,000 of real estate, and for the release of her claim upon $88,000 of personal property, being $5. Certainly the terms of this statute were not complied with to bar her dower. Section 5747 provides that—

" Such assent shall be expressed, if the woman be of full age, by her becoming a party to the conveyance by which it is settled, and, if she be under age, by her joining with her father or guardian in such conveyance."

And by the next section it is provided:

" Any pecuniary provision that shall be made for the benefit of an intended wife, and in lieu of dower, shall, if assented

to, as provided in the preceding section, bar her right of dower in all the lands of her husband."

By the common law, no provision or settlement made by a a man before his marriage in favor of his future wife could bar dower. *Vincent v. Spooner,* 2 Cush. 467. The reason of this rule of the common law was that dower, being a freehold estate, by a maxim of the common law could not be barred by a collateral satisfaction. *Hastings v. Dickinson,* 7 Mass. 153; *Logan v. Phillips,* 18 Mo. 22; *Jones v. Powell,* 6 Johns. Ch. 196; *Murphy v. Murphy,* 12 Ohio St. 407. Neither at the common law nor under the statute was this contract sufficient to bar dower.

Referring to the letter left by Dr. Pulling, it is clear that it was the intent of the parties that the effect of the agreement signed by Mrs. Pulling, if any effect was to be given to it at all, was to bar her dower, so that, as he expressed it, "in the final settlement of the estate her dower right would not interfere with or prevent a distribution of the property during her life." This was one of the purposes, and apparently the main purpose, of the agreement, except, as shown by his letters, to satisfy his daughters. From all these documents, and the letters written by Dr. Pulling, we are unable to say that it was the intent of the parties that the widow should not receive her distributive share of the personalty. It does not seem probable, in view of the repeated expressions of the doctor in his letters and the writings, that it was ever understood that the widow, in case of the death of the husband, was to be deprived of all participation in the estate. We think that was not the intention of the parties, and that to enforce such a contract would be to open the door in that class of cases to the grossest fraud. Here was personalty to the amount of $88,000, and an attempt is made to enforce an agreement which, to say the least, is ambiguous when all the papers are taken together, and, by it, to cut off the widow without a dollar.

The language of Mr. Justice Sharswood in *Kline v. Kline,* 57 Penn. St. 120, may well be applied to the present case. There an attempt was made to enforce an antenuptial agreement. The court below charged:

" The woman was bound to exercise her judgment, and take advantage of the opportunity that existed to obtain information; if she did not do so, it was her own fault. The parties were dealing at arm's length. He was not bound to disclose to her the amount or value of his property."

The learned justice, remarking upon this, said:

" There is, perhaps, no relation of life in which more unbounded confidence is reposed than in that existing between parties who are betrothed to each other. Especially does the woman place the most implicit trust in the truth and affection of him in whose keeping she is about to deposit the happiness of her future life. From him she has no secrets; she believes he has none from her. To consider such persons as in the same category with buyers and sellers, and to say that they are dealing at arm's length, we think is a mistake. * * * If, indeed, this agreement was intended to debar the wife of all future right to any share of her husband's estate in case she survived him, it was a most unequal and unjust bargain. * * * It bestows on her a portion of the house for life, with her own household goods which she owned before marriage, and the small annuity of $40 a year, or about eleven cents a day, to feed and clothe her, to find medical attendance and nursing for her when sick, and to bury her decently when she died. If, as has happened, she should find herself a solitary widow, without children, at the advanced age of seventy, such a pittance leaves her to be an object of private charity or public relief. To say that she was bound, when the contract was proposed, to exercise her judgment; that she ought to have taken advantage of the opportunity that existed to obtain information; and that, if she did not do so, it was her own fault,—is to suggest what would be revolting to all the better feelings of woman's nature. To have instituted inquiries into the property and fortune of her betrothed would have indicated that she was actuated by selfish and interested motives. She shrank back from the thought of asking

a single question. She executed the paper without hesitation and without inquiry. She believed that he would propose nothing but what was just, and she had a right to exercise that confidence."

In the present case Mrs. Pulling signed a paper saying she did not care to know the value of the estate. This is explained by the statement in the paper left by the doctor that "she confided in him entirely about doing for her what was just and proper."

Under the circumstances, the probate and circuit courts were right in their interpretation of the contract, and in awarding to the widow her distributive share of the estate.

The judgment of the probate and circuit courts must be affirmed, with costs. It will be so certified to the probate court of Wayne county.

The other Justices concurred.