### HOCKENBERRY v. DONOVAN.

1. Husband and Wife — Fraud — Marriage Settlement — Release of Wife's Interest.

Upon a consideration of conflicting testimony, complainant's claim that she was induced by fraud to enter into an agreement with her intended husband, releasing dower and her statutory rights as his wife, in consideration of marriage and of a similar release on his part, is *held* not proved.

2. Same—Construction of Contract—Dower.

Under provisions waiving all right of participation in her prospective husband's estate as his wife or widow, barring dower and homestead rights, and waiving all rights of distribution in personal property thereof and all statutory interest, complainant lost any rights she may have had under Act No. 285, Pub. Acts 1909.[1]

3. Same—Statutes—Barring Dower—Jointure.

The method of barring dower by jointure as provided by §§ 8931, 8932, 3 Comp. Laws, does not exclude or prohibit the method of barring dower by antenuptial contract, adopted by the parties.

4. Same—Public Policy.

Nor was the contract against public policy.

[1] Waiver of right to widow's allowance by antenuptial agreement, see note in 25 L. R. A. (N. S.) 751.

5. SAME—CONSIDERATION FOR CONTRACT.

    Besides the consideration of marriage, which is sufficient to support such a settlement, the mutual agreement of each to waive all interest in the property of the other constituted sufficient consideration.

Appeal from Eaton; Smith, J. Submitted April 2, 1912. (Docket No. 6.) Decided May 31, 1912.

Bill by Emma C. Hockenberry against Robert Donovan, administrator of the estate of Clinton Hockenberry, deceased, and others, for the cancellation of an antenuptial contract of settlement, for alleged fraud. From a decree for defendants, complainant appeals. Affirmed.

*Adsit & Danhof*, for complainant.

*Lyman H. McCall*, *Horace S. Maynard*, and *Frank A. Dean*, for defendants.

The complainant in this case is the widow of Clinton Hockenberry, and the defendants, other than Robert Donovan, who is the administrator of his estate, are a daughter by a former wife and four grandchildren, children of a deceased son of his first wife. Three of the grandchildren, William J., Agnes, and Ruth, are infants from 9 to 14 years of age.

On December 20, 1902, complainant, then 45 years of age, married Clinton Hockenberry. She had been previously married, and was divorced from her first husband in 1887. On the day of her marriage, and in contemplation thereof, she entered into two contracts with her prospective husband. The contracts follow:

"This indenture, made this 20th day of December, A. D. 1902, by and between Clinton Hockenberry of the city of Charlotte, county of Eaton, and State of Michigan, party of the first part, and Emma C. Woolley of Grand Rapids, county of Kent, and State of Michigan, party of the second part, witnesseth:

"That whereas, a marriage has been agreed upon and is intended to be duly had and solemnized between Clin-

ton Hockenberry and the said Emma C. Woolley; and
whereas the said Clinton Hockenberry is possessed in fee
simple of certain lands, messuages, tenements, heredita-
ments, hereinafter mentioned; and whereas it is the in-
tention of the said party of the second part by this indent-
ure to bar her dower interest as the wife or widow of said
first party in and to all such real estate, land, messuages,
tenements, and hereditaments and to empower and au-
thorize the said first party at any time during the exist-
ence of the coverture between the parties, or at his death,
his heirs, executors or administrators to sell, dispose of,
assign or convey any and all of said land, tenements, mes-
suages, and hereditaments aforesaid, and to make and
execute, a good and sufficient deed therefor independent
of and without the consent or privity of the said party of
the second part; and also to bar the dower interest of the
said second party as the wife or widow of the said party
of the first part in and to all property that he may be-
come seised of and not owned by him at the time of
their marriage, and to authorize the conveyance thereof
in the same manner as real estate now owned and pos-
sessed by him; and whereas, it is the intention of said
second party to waive as well all her homestead rights or
interests in and to any of the said property now owned by
said first party, or that may come into his possession and
he become seised of during the period of coverture or as
the widow of said first party; and whereas, it is also the
intention of said second party to waive all her rights, title
and interest either as the wife of said first party or as his
widow in and to any and all personal property that he
may own at the time of their said marriage or at any time
during the coverture or at the time of his death:

"Now, therefore, this indenture witnesseth: That the
said party of the second part for and in consideration of
the sum of fifty dollars ($50) to her in hand paid the receipt
whereof is hereby acknowledged, and a further consider-
ation of the solemnization of marriage between said first
party hereto, and said second party and the further con-
sideration of the conveyance by deed by the said first party
to said second party of the following described real estate
situate in the city of Charlotte, county of Eaton, State of
Michigan, described as follows, to wit: The east one-half
(½) of lots numbers one (1) and four (4) on block nine (9).
Said second party does hereby agree to waive and surrender
all of her right, title and interest which shall or may be

hereafter vested in her because of said marriage and as the wife or widow of said first party, and consisting of both dower and homestead rights and interest in and to all lands now owned by said first party, and in and to all lands which said first party may hereafter become invested.

"The said party of the second part does hereby and for the consideration hereinbefore expressed waive and agree to waive all her rights of dower which shall or may vest in her by reason of her marriage with the said first party or as his wife or widow in and to all of the lands, tenements and hereditaments of the said party of the first part now has or shall hereafter and during coverture become seised either for life or in fee. And the said second party does hereby and for the consideration hereinbefore expressed waive all homestead rights which shall or may vest in her by virtue of her said marriage with said party in and to the real estate which said first party now has or may hereafter become invested, or which may hereafter be conveyed to and vest in said first party during their coverture as aforesaid as the wife of said first party. And the said second party for the consideration heretofore expressed does agree to waive all her rights, title and interest which shall or may be vested in her by virtue of said marriage with said first party as his said wife or widow, and in and to all personal property which is now owned by him or of which he shall hereafter become possessed, and the said second party does hereby promise and agree that she will at the request of said first party and at any and all times as he may desire execute jointly with him any and all deeds of conveyance of any of the real estate now owned or hereafter owned by him, or which he may hereafter become seised, so that such deeds of conveyance when executed and recorded shall show a perfect record title.

"It being, however, expressly understood and agreed that the said first party his heirs, executors and administrators may convey any and all of said real estate which he now or shall hereafter be seised of without the second party joining with him or them in such deed, and that such deed of conveyance without the signature of said second party shall pass a clear and perfect title of said land so conveyed and shall bar her dower and homestead rights to the same extent as though said second party had joined with the said first party in such deed or deeds of conveyance. It being the intention of the said second party by this instrument to bar any and all rights of dower or of

homestead rights in and to all of the estate of whatsoever nature, lands, tenements, hereditaments and messuages which the said first party now is or shall hereafter become seised of, also to convey and waive all her rights and title in and to any and all personal property now in the possession of said first party or which may be in his possession at any time during his life or at his death, both as the wife or widow of said first party. And the said second party does hereby further agree that in case she shall survive the said first party she will accept in lieu of her dower or homestead interests in and to all of the lands and tenements, messuages, and hereditaments of said first party, and also any and all property of which said first party shall or may become seised between the time of said marriage and his said death, and also in lieu of all personal property of which he may now be possessed or shall be at the time of his death, any device or bequest which said first party may see fit to make for her, said second party, by will or otherwise, if he so elects.

"In consideration of the premises and undertakings made by the said second party, the said first party does hereby promise and agree by and with said second party that he will without unreasonable delay enter into a contract of marriage with her the said second party herein, and will thereby subject himself and all the liabilities created by the solemnization of marriage, subject to the terms and conditions of this contract.

"In witness whereof, the parties hereto have set their hands and seals the day and year first above written.

"CLINTON HOCKENBERRY.   [L. S.]
"EMMA C. WOOLLEY.   [L. S.]

"Witnesses:
"GUY M. ROWLEY.
"L. H. McCALL."

"CHARLOTTE, MICH., Dec. 20, 1902.

"In contemplation of marriage, for the purpose of adjusting property between Clinton Hockenberry and Emma C. Woolley, it is agreed mutually between the parties hereto that the said Woolley is to have no interest in any of the property of the said Hockenberry, whether personal or real estate, statutory or dower, except whatever provision the said Hockenberry may voluntarily and of his own free will and accord make for her during the time of their natural lives and it is agreed that the said Hockenberry shall have no interest whatever in any of the prop-

erty of the said Woolley and any improvements placed upon said property by said Hockenberry or money or other property given to her or other provisions made for her by said Hockenberry, during life shall be her sole property and at death shall descend to her heirs without molestation from the said Hockberry, his heirs or other person whatsoever.

"EMMA C. WOOLLEY.
"CLINTON HOCKENBERRY.

"[In duplicate.]"

Complainant and Clinton Hockenberry continued to live together as man and wife until November 14, 1909, when Hockenberry met with a violent death while hunting.

The only will found was one dated June 9, 1894. This will was made during the lifetime of his first wife, who died October 12, 1896. Of course, no provision was made in that will for this complainant. The will was admitted to probate and an administrator with the will annexed was duly appointed. The administrator filed his final account, produced the antenuptial agreements, and petitioned the probate court for an order of distribution of the estate to Hockenberry's heirs, exclusive of complainant. Complainant thereupon filed her bill herein, averring that the agreements were obtained by duress and fraud, and praying that they be set aside and held for naught. To this bill, defendants answered by way of cross-bill, praying that said contracts be construed to be valid and of full force and effect. From a decree dismissing complainant's bill of complaint and granting to defendants the relief prayed, complainant appeals.

BROOKE, J. (*after stating the facts*). It is the claim of complainant that she was induced to execute the first contract (drawn by L. H. McCall) by fraud, and that at the time she executed it she was so agitated and confused that she did not understand or appreciate its legal import. As to what occurred at and immediately before the time of its execution, we have the evidence of her sister, upon the one hand, and, upon the other, the evidence of Mr.

McCall, who drew the paper, and Mr. G. M. Rowley, a justice of the peace and business man of Charlotte. The interest and bias of Mrs. Fowler is obvious. The record shows a relationship of an extremely intimate character between the two sisters; and that the complainant (herself childless) had stated that she desired Mrs. Fowler to inherit her property.

Mrs. Fowler, who had kept a millinery store in Charlotte for many years, testified that on the day in question Hockenberry called upon her sister at her place of business, and that she was called upstairs, where they were; that Hockenberry said to her,

"Mrs. Fowler, Emma and I have made up our minds to get married tonight. I have a little business with Emma down at Mr. McCall's office, and I want you to go with her. You see my children don't want me to get married, and I have had to have a paper drawn up for her to sign. It don't make a d—n bit of difference to her whether she signs it or not (pardon me, Mrs. Fowler). I will take good care of her while she is my wife, and will amply provide for her in case of my death; but it will satisfy the children, and must be signed before we are married."

The witness further testified: That she accompanied her sister to the office of L. H. McCall, where the contract was read and executed; that complainant was much agitated, and paid little attention to the paper; that when the reading was commenced complainant said:

"There is no use of your reading that to me. I don't care anything about it. I have a good understanding with Mr. Hockenberry, and I trust him fully."

That Mr. Hockenberry and herself were trying to calm the agitation of complainant, when Mr. Hockenberry again assured complainant that it would make no difference to her whether she signed or not, as he would provide for her in case he should die first, to which complainant replied, "I can trust you, papa."

Upon cross-examination, this witness testified:

"*Q.* Did Mr. McCall, at that time, state to you and your sister that your sister, by the terms of that contract, waived all rights in the property of Mr. Hockenberry?

"*A.* I think so.

"*Q.* Did you understand that when he stated it to you?

"*A.* I might—yes; I might have understood it, and yet I paid so little attention."

The hour of this interview is fixed by both this witness and complainant at about 4 o'clock p. m. Standing against this testimony, we have the evidence of L. H. McCall and G. M. Rowley. Mr. McCall is an attorney of experience and good repute. Both testify that the contract was read over to complainant and explained to her, and in particular it was explained to her that if she signed it she would waive all rights in Mr. Hockenberry's property, real and personal. They deny that upon that occasion Mr. Hockenberry told complainant it would make no difference to her if she signed the paper, as he would provide for her in case he went first. Mr. McCall testifies that Mr. Hockenberry said:

"Well, if you don't want to sign the contract, the marriage will be off with."

Both Mr. McCall and Rowley testify that the deed mentioned in the contract was executed and delivered to complainant at this interview. Both these witnesses are of good repute, and neither has the slightest apparent interest in the subject-matter of the case.

That deed was recorded at 9:45 a. m. on the morning of December 20th. It is apparent, therefore, if these witnesses are not mistaken as to the time of delivery, Mrs. Fowler and complainant are mistaken as to the hour at which the contract was signed. Apparently *after* the first contract was executed, complainant and Hockenberry went to the office of Mr. J. M. C. Smith, where the second contract was drawn and executed. It is worthy of note that there is no averment of fraud, coercion, or lack of comprehension in reference to this contract. Mr. Smith is a lawyer of ripe experience, at present representing his

district in Congress. He testifies that he prepared the agreement at the request of both of the parties; that they executed it in his presence; and that he noticed nothing unusual in the appearance of the complainant at that time. Much testimony was introduced by the defense tending to show that complainant had frequently asserted that she married Mr. Hockenberry, not for his money, but for companionship. A rather noteworthy fact in connection with the hearing in this case is that neither complainant nor her sister were examined in open court. Their depositions, both in chief and upon rebuttal, were taken before a notary public and read at the hearing.

Considering the age and experience of the complainant, the relative situation of the parties, and in the light of the testimony in this record, we have no hesitation in agreeing with the learned circuit judge that the complainant—

"Was not misled as to the contents thereof; that it was explained to Mrs. Woolley by Mr. McCall that if she signed the contract she would waive all rights in the property of Mr. Hockenberry; that she understood that the object of the making of the contract was to bar her participation in the estate of Mr. Hockenberry, if they were married, and she should survive him."

In the second or "Smith" contract, two considerations appear: The covenant of marriage and the mutual agreement of each to waive all interest in the estate of the other. The reason for this contract is apparent, when consideration is given to the fact that complainant herself was at the time possessed of some real estate, aside from that conveyed to her on that day by Hockenberry, and, in case of her death before that of her husband, she desired it to descend to her sister, Mrs. Fowler.

We have no doubt that complainant was acquainted in a general way with Hockenberry's financial reputation, which was that of a prosperous farmer in the community, and that she deliberately entered into the contract, hoping, perhaps, to be able to induce her prospective husband to make further provision for her by gift *inter vivos* or

by will; and it may be that his untimely end alone prevented the realization of one or the other. In any event, it is, we think, clear that, confronted with the alternative of signing the contract or foregoing the marriage, she chose the former.

It should be remembered that complainant lacked neither years nor experience   She had reached that age when sentimental considerations in new marital undertakings are supposed to have little weight.   It is difficult to believe that such a woman could be readily coerced or deceived.

But it is urged in her behalf that, even if the contracts are held to be valid, her dower and homestead rights *only* are cut off; and that under Act No. 286 of the Public Acts of 1909 she is still the owner in fee of an undivided one-third of the lands of which Clinton Hockenberry died seised. It would seem that a simple reading of the first contract would be a sufficient answer to this claim.   In it she repeatedly bars herself from all participation in the estate of Hockenberry as his *wife* or *widow*, and all interest which shall or may be vested in her by virtue of her marriage. It can hardly be contended that the statute in question confers any rights upon widows, except by virtue of marriage.   But the second contract is absolutely conclusive upon this point; for in it complainant releases all interest in the property of Hockenberry, "whether personal or real estate, *statutory* or dower." The interest now claimed for her is entirely statutory, which, by the express terms of the instrument, she has waived.   It is unnecessary to consider or discuss the point raised by defendants that the statute relied upon can have no bearing, because passed long after the contract in question was entered into.

Complainant contends that the contracts do not constitute a legal jointure or pecuniary provision under 3 Comp. Laws, §§ 8931, 8932, and 8933.   This may or may not be true; and it is immaterial whether it be true or not.   The fact that the law provides by statute a method of barring

dower by jointure does not deprive the intended wife of the power to bar her dower by any other valid form of antenuptial contract. *Barth* v. *Lines*, 118 Ill. 374 (7 N. E. 679, 59 Am. Rep. 374); *Stilley* v. *Folger*, 14 Ohio, 610; *Naill* v. *Maurer*, 25 Md. 532; *Logan* v. *Phillips*, 18 Mo. 22; *Desnoyer* v. *Jordan*, 27 Minn. 295 (7 N. W. 140); 14 Cyc. p. 940.

Where the parties entering into an antenuptial contract are of mature years and have full understanding of the meaning of the instrument, the agreement, if based on a sufficient consideration, and in the absence of fraud, is valid and enforceable, and is not against public policy. Marriage alone has been held a sufficient consideration to support a marriage settlement. *Dunlop* v. *Lamb*, 182 Ill. 319 (55 N. E. 354).

In this case, however, there is another consideration. There is a mutual agreement on the part of each to waive all interest in the property of the other. This constitutes a good consideration. *Yarde* v. *Yarde*, 187 Ill. 636 (58 N. E 600). See, also, 1 Bishop on the Law of Married Women, §§ 420, 423, and 427; 21 Cyc. p. 1248; 19 Am. & Eng. Enc. Law (2d Ed.), p. 1233; Schouler's Domestic Relations (5th Ed.), §§ 171, 173; 2 Story's Equity Jurisprudence (13th Ed.), §§ 1367, 1368, 1370.

After a review of the authorities and a full consideration of the facts, we are convinced that the decree of the court below, dismissing complainant's bill and finding that the contracts in question were valid and binding upon complainant, is a proper one.

The decree is affirmed, with costs of both courts.

MOORE, C. J., and STEERE, MCALVAY, BLAIR, STONE, and OSTRANDER, JJ., concurred. BIRD, J., did not sit.