## *In re* BENKER ESTATE

## COUNTS v BENKER

Docket No. 65387. Argued June 3, 1981 (Calendar No. 9).—Decided December 23, 1982.

Charles Benker and Elizabeth Stewart entered an antenuptial agreement providing for the waiver of Elizabeth's right, upon the death of Charles, to take her statutory share of his estate. Following Benker's death, Ruth Counts, administratrix of his estate, petitioned the Wayne County Probate Court for a determination of the validity of the agreement and for instructions on the assignment of the residue of the estate. The probate court, Joseph J. Pernick, J., found the agreement to be invalid, holding that there was a presumption of non-disclosure of Benker's assets upon the execution of the agreement and that the evidence offered was insufficient to rebut the presumption. The Wayne Circuit Court, John M. Wise, J., affirmed. The Court of Appeals, D. C. Riley, P.J., and R. B. Burns and D. E. Holbrook, Jr., JJ., reversed and remanded to the probate court, holding that it was incumbent upon the widow, the party seeking to invalidate the antenuptial contract, to carry the burden of proving non-disclosure (Docket No. 43369). Elizabeth Benker appeals.

In an opinion by Justice Williams, joined by Chief Justice Fitzgerald and Justices Kavanagh, Levin, Coleman, and Ryan, the Supreme Court *held:*

For an antenuptial agreement to be valid, there must be a fair disclosure of assets by both parties. Generally, where the validity of an agreement is challenged, the burden of proof is on the challenger. However, on the facts of the case, a rebuttable presumption of non-disclosure by the husband arose, and it was incumbent upon the administratrix of his estate to offer evidence to rebut the presumption.

1. Antenuptial agreements which relate to the parties' rights upon the death of one of the parties are favored by public

REFERENCES FOR POINTS IN HEADNOTES
[1, 2] 41 Am Jur 2d, Husband and Wife § 297.
[2] 41 Am Jur 2d, Husband and Wife §§ 275, 313-315.

policy. The agreements are of a special nature because the relationship of the parties is one of extreme mutual confidence, a situation unlike that of a commercial contract in which the parties deal at arm's length. For the agreement to be valid, it must be fair, equitable, and reasonable in view of the surrounding facts and circumstances. Each party must enter the agreement voluntarily, understanding his or her rights and the extent of the waiver of such rights. Because of this, the antenuptial agreement gives rise to a special duty of disclosure not required in the ordinary contract relationship.

2. The burden of proving non-disclosure of assets upon making an antenuptial agreement is on the party seeking to invalidate the agreement. However, a rebuttable presumption of non-disclosure may arise where, as in this case, the agreement provides for the complete waiver by the widow of all rights in her husband's property and her right of election without making any provision for her upon her husband's death; the husband's estate is ample compared to the wife's; the decedent is shown to have been rather secretive about his financial affairs, to have lived modestly, and to have given no outward appearance of wealth; the agreement does not indicate, generally or specifically, whether the parties were fully informed of each other's property interests; the widow was not represented by independent counsel; and the drafter of the agreement could not testify that full disclosure was made by the parties before entering the agreement, and had no concern at the time of the agreement about the widow's share of the property upon her husband's death.

Once a presumption of non-disclosure is raised on the basis of the facts, it is incumbent upon the opposite party to introduce evidence to rebut the presumption. In this case, the evidence was insufficient to rebut the presumption.

Reversed.

97 Mich App 754; 296 NW2d 167 (1980) reversed.

1. HUSBAND AND WIFE — ANTENUPTIAL AGREEMENTS — VALIDITY — DISCLOSURE OF ASSETS.

An antenuptial agreement, to be valid, must be fair, equitable, and reasonable in view of the surrounding facts and circumstances; each party must enter the agreement voluntarily and must provide fair disclosure of assets to enable the other to understand the rights involved and the extent of the waiver of such rights.

2. HUSBAND AND WIFE — ANTENUPTIAL AGREEMENTS — DISCLOSURE
   OF ASSETS — BURDEN OF PROOF — PRESUMPTIONS.

> The burden of proving non-disclosure of assets upon making an
> antenuptial agreement is on the party seeking to invalidate the
> agreement; however, a rebuttable presumption of non-disclo-
> sure may arise where the agreement provides for the complete
> waiver by the widow of all rights in her husband's property and
> of her right of election without making any provision for her
> upon her husband's death; the husband's estate is ample com-
> pared to his wife's; the decedent is shown to have been rather
> secretive about his financial affairs, to have lived modestly, and
> to have given no outward appearance of wealth; the agreement
> does not indicate, generally or specifically, whether the parties
> were fully informed of each other's property interests; the
> widow was not represented by independent counsel; and the
> drafter is unable to testify that full disclosure was made by the
> parties, and had no concern at the time of the agreement about
> the widow's share of the property upon her husband's death.

*Faintuck, Shwedel, Wolfram, McDonald & Zip-
ser* (by *John J. McDonald*) for the plaintiff.

*Leib & Leib* (by *Jeffrey M. Leib*) and *Gregory
Gelfand* (of counsel) for the defendant.

WILLIAMS, J.

## INTRODUCTION

The issue presented in this case is whether the
probate court erred in invalidating an antenuptial
agreement which totally eliminated the widow's
marital interest in her husband's property, by
recognizing a presumption of non-disclosure of
assets against the decedent husband under the
following facts.

The specific facts which gave rise to the pre-
sumption of non-disclosure are 1) the lack of any
provision for the widow in the agreement, 2) the
deceased husband's very ample estate compared to
the widow's, 3) the modest lifestyle of the decedent

husband and the lack of any outward appearance of wealth, 4) no indication, in general or specific terms, that either party was informed as to the property interests of the other, 5) the lack of independent counsel representing the widow, 6) the attorney who drafted the agreement could only testify as to his normal procedure which included a discussion of assets, but did not include the disclosure of undisclosed assets, and 7) the scrivener testified that he was not concerned with what the widow would get.

Antenuptial agreements are, in general, favored by public policy. In order to be valid, however, there must be fair disclosure of assets by both parties. We agree with the Court of Appeals and hold that, generally, the burden of proof is on the party asserting the invalidity. However, we agree with the probate court and hold that the facts in this case gave rise to a rebuttable presumption of non-disclosure by the husband and, thus, that it was incumbent upon his administratrix to offer evidence to rebut this presumption. She, however, failed to do so. We therefore reverse the judgment of the Court of Appeals for failing to recognize the rebuttable presumption issue and reinstate the judgment of the probate court.

## I. Facts

On December 15, 1976, Charles Benker died intestate leaving as his sole heirs at law his widow, Elizabeth Benker, and Ruth Counts, a daughter from a previous marriage, who was appointed administratrix of his estate. Three days prior to the marriage, Mrs. Benker, defendant in

this case, and the decedent entered into an antenuptial agreement, the subject of this litigation.[1]

The decedent and his widow each had been married once before, and each had one child from the previous marriage. The couple was married in 1963 after knowing each other for over 20 years through employment at Ex-Cell-O Corporation. Decedent was in charge of maintenance prior to retiring in 1959, and defendant worked in maintenance and later in the inspection department. Decedent was 71 years old when the marriage took place, and defendant was 60 years old.

Decedent left a very substantial estate when he died, $640,500, of which $221,500 was in a trust account at First Federal Savings and Loan Association for the benefit of his daughter. Despite the worth of his estate, decedent had a modest lifestyle. He did not display his wealth at all and was somewhat secretive about it. He lived in a most modest neighborhood in Highland Park, his house was valued at $3,000, and he drove a car worth approximately $500. His daughter testified that she did not realize the extent of her father's estate.

She first became involved in assessing her father's wealth when she was appointed guardian on April 14, 1976, when decedent was adjudicated legally incompetent by the Wayne County Probate Court. At that time, she estimated his estate at $9,500.

The surviving widow has also been adjudicated legally incompetent and therefore was unavailable

---

[1] The antenuptial agreement executed by Charles Benker and Elizabeth Stewart on May 29, 1963, is set forth in the Appendix.

to testify at the trial. On September 28, 1976, her son was appointed guardian with assets of the guardianship estate being estimated at $110,000. The guardianship continues in effect.

The antenuptial agreement at issue here was signed by Elizabeth Stewart and Charles Benker on May 29, 1963. The agreement contains no reference to the assets of either party, generally or specifically, nor does it make any statement at all regarding disclosure of assets by the parties to the agreement. The agreement provides for a complete waiver of rights by the widow to take by the laws of descent and distribution, provided by the following language of the contract:

"(8) The party of the second part likewise waives all right of inheritance, under the laws of descent and distribution of property of any jurisdiction in or to any estate or property of the party of the first part dying intestate, and does also waive all rights as a widow, in the event of death of the party of the first part, to elect to take against or contrary to any last will and testament or codicil executed by the party of the first part and admitted to probate."

But the agreement failed to state whether there was an understanding on her part that the husband's rights in her estate were far less substantial than the wife's rights in his estate and that therefore she was waiving far more than he was.

The attorney who prepared the agreement, Mr. William Dye, testified in a deposition on September 12, 1977. He could not recall specifically the steps taken for this particular agreement, but testified as to his "normal procedure" in such a situation which would include a discussion of assets. Mr. Dye later testified as follows in response

to a question asking how he insured that there
was full disclosure of assets by each party:

> "Well, I didn't press the full disclosure matter, for
> the simple reason that once you outline to your clients
> the purpose of a prenuptial agreement, then they dis-
> close their assets to you. You don't press them for
> undisclosed assets, or at least I didn't."

Mr. Dye also stated that the main objective of an
antenuptial agreement, in general, was to retain
the status quo of each party, and that he was not
concerned with what Mrs. Benker would receive
upon Mr. Benker's death. He represented both
parties in executing this agreement and felt that
he had an obligation to make sure that this was
"an arm's length transaction" between the two of
them. He was acquainted with Mr. Benker
through his father's association with Ex-Cell-O
Corporation as general counsel. Mr. Dye could not
recall much of the events leading up to the execu-
tion of the subject agreement.

The antenuptial agreement became the subject
of controversy when plaintiff, as administratrix of
her father's estate, petitioned the probate court to
determine the validity of the antenuptial agree-
ment and to instruct as to the assignment of the
residue of the estate. After hearing testimony on
the issue, the probate court allowed the parties to
submit briefs as to which party had the burden of
proof and whether there was a presumption of
non-disclosure on the part of the deceased husband
in light of the facts presented. On January 9, 1978,
the probate court, without deciding which party
had the burden of proof in attacking the validity
of antenuptial agreements for failure of disclosure,
held that there was a presumption of non-disclo-
sure and that the evidence presented was not

sufficient to rebut the presumption. Therefore, the agreement was held to be invalid. This decision was appealed to the circuit court which summarily affirmed. The Court of Appeals reversed and remanded, holding that the trial court erred by not allocating the burden of proof to defendant widow, the party seeking to invalidate the antenuptial contract. 97 Mich App 754; 296 NW2d 167 (1980). We granted leave to appeal on December 19, 1980. 410 Mich 868.

## II. Antenuptial Agreement and the Duty of Disclosure

It is now generally recognized that antenuptial agreements which relate to the parties' rights upon the death of one of the parties are favored by public policy.[2] MCL 557.28; MSA 26.165(8) recognizes such contracts and provides that:

"A contract relating to property made between persons in contemplation of marriage shall remain in full force after marriage takes place."

Such agreements, while recognized as valid instruments, are of a special nature because of the fact that they originate between parties contemplating

_____

[2] In paragraph 11 of the subject agreement, the parties agreed that: "[i]n the event of divorce or legal separation, each of the parties waives all right to any award or share of the property of the other, and all alimony."

The probate court held that such a clause that provides for, facilitates, or tends to induce a separation or divorce of the parties after marriage, contravenes public policy and is therefore void. _In re Muxlow Estate_, 367 Mich 133; 116 NW2d 43 (1962). However, the court concluded that such a clause did not affect the provisions concerning rights on death. This issue has not been raised on appeal to this Court, and, therefore, we need not consider the issue.

marriage.[3] This relationship is one of extreme
mutual confidence and, thus, presents a unique
situation unlike the ordinary commercial contract
situation where the parties deal at arm's length.

In order for an antenuptial agreement to be
valid, it must be fair, equitable, and reasonable in
view of the surrounding facts and circumstances.
It must be entered into voluntarily by both par-
ties, with each understanding his or her rights and
the extent of the waiver of such rights. *Hocken-
berry v Donovan,* 170 Mich 370, 380; 136 NW 389
(1912). Antenuptial agreements give rise to a spe-
cial duty of disclosure not required in ordinary
contract relationships so that the parties will be
fully informed before entering into such agree-
ments. The Legislature has recognized the validity
of agreements that provide for the waiver of rights
by a surviving spouse in the decedent's estate, but
specifically requires fair disclosure:

"The rights of the surviving spouse to an estate or to
dower under sections 1 to 29 of chapter 66 of the
Revised Statutes of 1846, as amended, homestead allow-
ance, election, exempt property, and family allowance
or any of them, may be waived, wholly or partially,
before or after marriage, by a written contract, agree-
ment, or waiver signed by the party waiving *after fair
disclosure."* MCL 700.291; MSA 27.5291. (Emphasis
added.)

The duty of disclosure is recognized by numer-
ous jurisdictions and is succinctly described in
Anno: *Setting Aside Antenuptial Agreement Based
on Non-Disclosure,* 27 ALR2d 883, 886, as follows:

"Where, as is usually the case, the parties to an

[3] Marriage alone is sufficient consideration for the antenuptial
agreement, and it need not be recited in the agreement. *Richard v
Detroit Trust Co,* 269 Mich 411, 413-414; 257 NW 725 (1934).

antenuptial property settlement occupy a confidential relationship toward one another, and the agreement substantially affects the property interests which one or the other would otherwise acquire by the marriage, each is under an affirmative duty to disclose to the other the nature of his property interests so that the effect of the agreement can be understandingly assessed, and in the absence of such a full and frank disclosure, the courts will refuse to give effect to such an agreement attacked by the spouse to whom disclosure should have been made." (Footnotes omitted.)

### III. BURDEN OF PROOF IN CHARGING NON-DISCLOSURE

It is clear that there is a duty to disclose one's assets to the other party entering into an antenuptial agreement. MCL 700.291; MSA 27.5291. 41 Am Jur 2d, Husband and Wife, § 297, pp 244-245. The Court of Appeals here properly interpreted the law of this state as placing the burden of proof on the party seeking to invalidate the agreement on the basis of fraud.

The Court of Appeals relied on *Richard v Detroit Trust Co,* 269 Mich 411; 257 NW 725 (1934). In *Richard,* p 416, there was an analysis of the prior case law[4] raising similar questions with this conclusion:

---

[4] The decisions in *In re Pulling Estate,* 93 Mich 274; 52 NW 1116 (1892), *Koch v Koch,* 126 Mich 187; 85 NW 455 (1901), *Hockenberry v Donovan,* 170 Mich 370; 136 NW 389 (1912), and *Detroit Trust Co v Baker,* 230 Mich 551; 203 NW 154; 204 NW 773 (1925), were cited and discussed.

In *Koch,* the Court held that the defendant failed to prove that the antenuptial contract was obtained by fraud. She alleged that she was misinformed as to the extent of her husband's property. The attorney who executed the agreement fully explained the matter to the defendant and told her that she would obtain more property upon her husband's death if there was no antenuptial agreement. Therefore,

"A consideration of these authorities shows that the law of this State recognizes the existence of a confidential relationship requiring good faith, fair dealings, and open disclosure, *but places upon the party charging fraud and a breach of confidence the burden of proof.*" (Emphasis added.)

In this case, the probate court distinguished *Richard* by stating that fraud had not been raised as an issue in these proceedings. It is difficult to support such a fine distinction given the language in *Richard* and the fact that non-disclosure when there is a duty to disclose is a form of fraud. See *United States Fidelity & Guaranty Co v Black,* 412 Mich 99; 313 NW2d 77 (1981). Clearly, in an antenuptial agreement there is a duty to disclose, MCL 700.291; MSA 27.5291, and, thus, while not labeled as a "fraud" claim, the burden of proof should be placed on the party alleging the invalidity.

We reaffirm, therefore, that the burden of proof rests on the party seeking to invalidate the antenuptial agreement because of non-disclosure by the other party. However, this does not end our analysis. We must, as the Court of Appeals failed to do, address the question whether there is a presumption of non-disclosure in certain cases, specifically the case at hand.

---

she failed to sustain her burden. Furthermore, the widow's property was not shown to be disproportionate to the husband's, and a settlement of value was made in her favor.

In *Detroit Trust Co v Baker,* defendant alleged that the antenuptial agreement was obtained by a fraudulent representation that it was a power of attorney. The Court held that this allegation was not supported by the evidence. It also concluded that the sum given in consideration for the release of dower rights did not itself warrant a finding of fraud or an abuse of the confidential relationship. Furthermore, the widow was left a valuable life estate by the decedent's will.

IV. Presumption of Non-Disclosure

A

Even if the burden of proof is on the party seeking to invalidate the antenuptial agreement on the basis of non-disclosure, there will be instances where there is sufficient evidence to raise a rebuttable presumption of non-disclosure. Many jurisdictions apply such a presumption when the antenuptial agreement provides a disproportionately small allowance for the wife.

"Where a confidential relationship exists between the parties to an antenuptial contract requiring the exercise of the utmost good faith in dealings between them, if no provision is made for the wife therein, or if the provision secured for her is inequitable, unjust, and unreasonably disproportionate to the means of the intended husband, taking into consideration the rights given her by law in the property of her husband in the event of his death prior to her death, then a presumption arises that the intended wife was not fully informed as to the value and extent of her prospective husband's property, and the courts will refuse to give effect to the contract, in the absence of proof affirmatively disclosing that proper disclosure was in fact made." 27 ALR2d 891-892. See 27 ALR2d 873 and cases cited therein.

We do not here adopt a presumption of non-disclosure based merely on a disproportionately small allowance for the wife,[5] but hold that the

[5] In *Detroit Trust Co v Baker*, 230 Mich 551, 556-557, the Court discussed whether the sum granted in lieu of dower rights was such that fraud should be presumed. The Court stated:

"We find no *indicia* of fraud, by way of misrepresentation or concealment or inadequacy in the amount agreed upon in lieu of dower. But it is said the sum given warrants the assumption that the confidential relation arising out of the promise to marry was abused. Conceding betrothal begets a confidential relation, it does not follow, *ipso facto*, that it engenders fraudulent desires in the swain, even

presumption is properly invoked when the facts are, in general, as follows. One, the antenuptial agreement provides for a complete waiver of all rights of inheritance and rights of election by the widow and does not make any provision for her upon her husband's death. Two, the husband's estate is very ample in comparison to the wife's. Three, the decedent was shown to be rather secretive about his financial affairs, lived very modestly, and gave no outward appearance of his wealth. Four, the agreement makes no reference whatsoever, in general or specific terms, to whether the parties had been fully informed of the property interests held by each other. Five, the widow was not represented by independent counsel. Six, the attorney who drafted the subject agreement testified in a deposition as to his normal procedure in such a matter and stated that he normally would discuss the assets of the parties, but that he did not press the full disclosure matter. Seven, the scrivener testified that he was not concerned with what the widow would get. These factors support the trial judge's decision to invoke the presumption of non-disclosure. A discussion of each of these factors is helpful.

though he be less bucolic than the widow about to be engrafted or that fraud is presumed to have been practiced to induce a widow of 31 to marry a man of 71, and agree to accept in lieu of prospective dower a substantial sum. In the absence of any testimony showing false representations, deceit or the withholding of information, we cannot predicate a finding of fraud or an abuse of the confidential relation, merely upon the sum here agreed. Neither does such sum under the disclosed circumstances, require plaintiffs to rebut a presumption of fraud. Until some existence of fraud more substantial than a possible wrong guess is presented there is nothing for plaintiffs to rebut."

*Detroit Trust Co* is distinguishable from the case at hand in that it only dealt with the waiver of dower rights, not the waiver of all rights in the decedent's estate. Nor were there the other factors of non-disclosure present in the instant case. In any event, we here agree with the analysis in *Detroit Trust Co* that the sum given for the waiver of rights, absent more, is not enough to give rise to the presumption of fraud.

1) and 2). The antenuptial agreement provides for a complete waiver by the widow of her rights in her husband's estate and her right of election. There was no provision whatsoever to compensate her for the waiver of her rights given by law in the husband's estate. The lack of any provision whatsoever, especially considering the size of the decedent's estate and the extent of the widow's rights in the property absent the antenuptial agreement, along with the other facts in this case, gives rise to a presumption of non-disclosure.[6] See *Juhasz v Juhasz,* 134 Ohio St 257, 263-265; 16 NE2d 328 (1938).

It should also be considered that the parties' estates were not of equal value. Mr. Benker's estate turned out to be worth $640,500, while Mrs. Benker's estate was estimated at $110,000. Thus, the parties were not in equal positions when executing the antenuptial agreement. Clearly, Mrs. Benker waived rights in her spouse's estate which turned out to be of a much greater value than the rights waived by the decedent. An antenuptial agreement that so substantially alters a person's rights must be entered into with full knowledge and understanding. If the contract is so entered into, the lack of provision for the party waiving rights will not invalidate the agreement. See 41 Am Jur 2d, Husband & Wife, § 298, p 245. But when there are allegations of non-disclosure along with no provision at all for the widow, the agreement and surrounding circumstances must be carefully scrutinized. See *Rosenberg v Lipnick,* 377 Mass 666; 389 NE2d 385 (1979).

3) The decedent in this case was shown to be rather secretive about his financial affairs, lived very modestly, and gave no outward appearance of

---

[6] See discussion of *Detroit Trust Co v Baker,* fn 5 *supra.*

his wealth. These facts, along with the others discussed, support the application of the presumption of non-disclosure. The property status of the decedent was not such that Mrs. Benker should have been aware of his wealth at the time of executing the agreement. See 27 ALR2d 898-901 and cases cited therein. It was not as if he had a general reputation for wealth and therefore that she should have been fully aware of the value of his assets regardless of disclosure on his part. See *Hockenberry,* 170 Mich 370, 378. It was quite the contrary. He lived in a $3,000 home in a lower-middle-class neighborhood in Highland Park, drove a car valued at $500, and had a modest lifestyle. His daughter testified that they had always lived modestly and that she was not aware of the trust left in her name nor of the total value of her father's estate. When the guardianship papers were filed in 1976 for Mr. Benker, his assets were valued at $9,500; yet he left an estate valued at $640,500 upon his death. We agree with the probate court that it was not sufficient that the decedent and defendant were both employed by Ex-Cell-O Corporation to support an argument that she should have been aware of his wealth. The argument that Mrs. Benker was or should have been aware of the decedent's wealth from other sources making the duty to disclose a mere ritual is not supported by the evidence.

4) The antenuptial agreement made no reference whatsoever, in general or specific terms, to whether the parties had been fully informed of the property interests held by each other. Such a statement is usually included in an antenuptial agreement to avoid a challenge at a later date. See *Snyder Estate,* 375 Pa 185; 100 A2d 67 (1953). Some contracts specifically itemize the property of

the parties so that there is no manner in which to challenge the agreement on the basis of non-disclosure. Neither approach was taken here. The antenuptial agreement makes absolutely no mention of disclosure of assets by the parties. That is not to say that the inclusion or absence of such a statement or inventory is necessarily conclusive, but it is a factor to be weighed. See 27 ALR2d 895-898 and cases cited therein.

5) The widow was not represented by independent counsel. Mr. Dye represented both parties in drafting and executing the antenuptial agreement. Representation of both parties by one attorney is allowed by the Code of Professional Responsibility

"if it is obvious that he can adequately represent the interest of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each." DR 5-105(C).[7]

There is no indication whether such disclosure was made, or whether the wife was fully informed as to the extent of the rights she was waiving, which were far greater than those waived by her husband. The fact that she did not have independent counsel before signing an antenuptial agreement that totally eliminated any right in her husband's estate, along with the other factors in this case,

[7] DR 5-105(C) applies to situations covered by DR 5-105, subds (A) and (B), which provide:

"(A) A lawyer shall decline proffered employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment, or if it would be likely to involve him in representing different interests, except to the extent permitted under DR 5-105(C).

"(B) A lawyer shall not continue multiple employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client, or if it would be likely to involve him in representing different interests, except to the extent permitted under DR 5-105(C)."

supports the application of the presumption of non-disclosure. See *Allison v Stevens,* 269 Ala 288; 112 So 2d 451 (1959).

6) The attorney who drafted the subject agreement testified in a deposition[8] as to his normal procedure in such a matter and stated that he usually would discuss the assets of the parties, but that he did not press the full disclosure matter.[9]

---

[8] Plaintiff contends that GCR 1963, 517.1, which states that "[f]indings of fact shall not be set aside unless clearly erroneous" is not applicable when the findings of fact are based on deposition testimony as opposed to live testimony by the witness. GCR 1963, 517.1 makes no such distinction. It only states that

"[i]n the application of this principle regard shall be given to the special opportunity of the trial court to judge the credibility of those witnesses who appeared before it."

We will thus apply the rule accordingly.

[9] A few excerpts from Mr. Dye's testimony regarding disclosure of assets are provided below:

"*A.* Well, with the reservation that I would have handled all antenuptial agreements in the same fashion, I would normally bring the people in, discuss their assets with them, discuss the purpose of an antenuptial agreement with them, prepare the document based upon that, then bring them in again, have them review the document, that is both parties, and then if all things being equal, that they were then satisfied with that agreement, and again being a prenuptial agreement, then I would conduct the ceremony, so to speak, of executing the agreement before a notary.

"*Q.* Do you recall, Mr. Dye, specifically the steps you took with respect to this particular antenuptial agreement?

"*A.* Not really.

"*Q.* This would be what you just outlined previously would be your normal—

"*A.* Yes, the basic purpose, as both you gentlemen know as attorneys, of a prenuptial agreement is to protect the—more or less to retain the status quo, so to speak."

\* \* \*

"*Q.* Do you recall, Mr. Dye, whether or not in this particular case you discussed the assets of the parties with both parties?

"*A.* Well, again I can only say in response to that, that the purpose of a prenuptial agreement, it follows from that purpose that you would. I always discuss their assets, because that's the only reason for it. If people go into a second marriage, so to speak, with very little or no assets, there would be no reason for this. So obviously I did discuss their assets."

\* \* \*

Mr. Dye did not recall the specifics of the circumstances surrounding the execution of the antenuptial agreement and, therefore, he testified as to his normal procedure in handling such a transaction. He stated that he normally would discuss the assets and review the document with the parties. He later stated, however, that he did not press for undisclosed assets. This statement, coupled with the fact that Mrs. Benker did not have independent counsel and with the fact that Mr. Dye felt this was an arm's length transaction between the two of them, raises some doubt as to whether there was an adequate disclosure of assets. Mr. Dye was the only person involved in the transaction who was available to testify as to the events surrounding the execution of the antenuptial contract because Mrs. Benker has been declared legally incompetent and Mr. Benker is deceased. The evidence regarding disclosure is weak, especially considering that Mr. Dye could not recall the specifics but could only testify as to his normal procedure.

7) The attorney who was the only one involved in the drafting of the antenuptial agreement testified that his interest was to see that the parties retained the status quo and that he was not concerned with what the widow would get. This attitude along with the scrivener's lack of interest in the disclosure of possible undisclosed assets and the fact that the wife-to-be was not represented by independent counsel combine to create a climate where full and fair disclosure might not have been

"*Q.* What steps if any did you employ in your typical practice, and in particular to this instance, if you can recall, to insure that there was a full disclosure by each to the other as far as assets?

"*A.* Well, I didn't press the full disclosure matter, for the simple reason that once you outline to your clients the purpose of a prenuptial agreement, then they disclose their assets to you. You don't press them for undisclosed assets, or at least I didn't."

obtained, thereby warranting a rebuttable presumption of non-disclosure.

## B

The presumption of non-disclosure was properly invoked in this case on the basis of all the facts discussed earlier. We must now address the nature of this presumption and its effect. The presumption of non-disclosure is a rebuttable one. Once the presumption is proper, it is incumbent upon the opposite party to introduce evidence to rebut the presumption. For a discussion of presumptions, see *In re Wood Estate,* 374 Mich 278; 132 NW2d 35 (1965). We agree with the trial court that the rebuttal evidence presented was not sufficient to overcome the presumption.

The evidence presented in this case consisted of the testimony of Mrs. Counts, the daughter of the deceased, the deposition testimony of Mr. Dye, the attorney who drafted the agreement, and the testimony of Mr. Stewart, the son of Mrs. Benker. The evidence presented did not contain facts sufficient to rebut the presumption of non-disclosure applicable in this case. Mrs. Counts testified that she was not aware of any of her father's financial matters and only became aware of the safe in his home (where most of his assets were kept) when she was informed about it when Mr. Benker went on a trip to Germany. Mr. Stewart testified that he was aware of the antenuptial agreement, but had never seen it. He was also not aware of his mother's financial affairs. The testimony of the daughter and son shed little light on whether there was or was not a disclosure of assets when the antenuptial agreement was executed.

The only other testimony was that given by Mr. Dye, the attorney who drafted the agreement. His

testimony did not establish what the circumstances surrounding this particular transaction were, and even as to his normal procedure the testimony was ambiguous. He did testify that he would normally discuss the parties' assets and go over the agreement with them point by point. But as to the possibility of undisclosed assets, he testified that he did not press the matter. Thus, the evidence presented is not enough to rebut the presumption of non-disclosure. We therefore hold that the antenuptial agreement entered into between the decedent and the defendant is invalid on the basis of the fact that there was not sufficient evidence to rebut the presumption of non-disclosure.

## Conclusion

We hold: (1) that the burden of proof of breach of fair disclosure falls upon the party charging it, and (2) that under the facts of this case the required proof by the party charging breach of fair disclosure was supported by a rebuttable presumption of non-disclosure. We further find that there were not sufficient facts to rebut this presumption of non-disclosure of assets. Therefore, we hold that the probate court properly held the antenuptial agreement to be invalid.

The judgment of the Court of Appeals is reversed.

FITZGERALD, C.J., and KAVANAGH, LEVIN, COLEMAN, and RYAN, JJ., concurred with WILLIAMS, J.

RILEY, J., took no part in the decision of this case.

APPENDIX

"Antenuptial Contract

"(Dated May 29, 1963)

"This antenuptial contract, made and entered into by and between Charles Benker, of 155 Geneva, Highland Park, Michigan, party of the first part, and Elizabeth Stewart, of 10 Ferris Avenue (Apt. 218), Highland Park, Michigan, party of the second part,

"Witnesseth:

"(1) Party of the first part and the party of the second part contemplate legal marriage, and it is agreed between them that all the properties of every name or nature, including expectancies, future interests and remainders, whether such properties are real or personal and wheresoever situated, belonging to the party of the first part before marriage, shall be and remain his own individual estate, and that this shall include all interest, rents and profits which may in time derive or accrue or result in any manner therefrom, either by way of income or from increase in or addition to capital.

"(2) All properties of every name or nature, real or personal, likewise including expectancies, future interests and remainders, wheresoever situated which belong to the party of the second part before marriage, shall be and remain her own individual estate, and this shall include all interest, rents and profits which may in time derive or accrue or result in any manner therefrom, either by way of income or from increase in or additions to capital.

"(3) It is agreed between the party of the first part and the party of the second part that each will sign with the other, all title papers, deeds, mortgages, consents, leases, assignments or other documents necessary to transfer, convery *[sic]* or encumber property of either, or any interest therein, when transferred or conveyed, or when encumbered or sold, and each agrees promptly to execute upon request any and all such documents, and acknowledge the same when necessary.

"(4) It is further agreed by the party of the first part and he does and will, from his own personal estate and his own subsequent earnings and accumulations, assume all necessary expense ·of the support and maintenance of the party of the second part.

"(5) It is further agreed that nothing herein contained shall be construed to be a bar to either party to this agreement giving any property of which such party may be the owner, to the other party by inter vivos gift, gift in trust, testamentary disposition or otherwise; it being understood that each party to this agreement shall control his or her own separate estate as described herein, and do with the properties thereof whatever they desire, including disposition by gift, gift in trust, or by testament, the same as either could or would do if no marriage relation existed between them.

"(6) All estate and property which hereafter may come to or accrue to either of the parties hereto to the exclusion of the other by reason of inheritance, gift, vesting, bequest or devise, shall be held and construed to be held as such party's own separate estate and property to the same extent as property owned prior to the contemplated marriage.

"(7) The party of the first part hereby waives all right of inheritance under the laws of descent and distribution of property of any jurisdiction, in or to any estate or property of the party of the second part dying intestate.

"(8) The party of the second part likewise waives all right of inheritance, under the laws of descent and distribution of property of any jurisdiction in or to any estate or property of the party of the first part dying intestate, and does also waive all rights as a widow, in the event of death of the party of the first part, to elect to take against or contrary to any last will and testament or codicil executed by the party of the first part and admitted to probate.

"(9) Nothing herein contained shall affect the rights of the parties with respect to (a) property acquired after marriage to which title is taken as joint owners, joint tenants or as tenants by the entirety; or property presently owned by either which, after marriage, may be placed in joint ownership, joint tenancy, or tenancy by the entirety by voluntary act of the parties; or (b) either of them; or (c) proceeds of life insurance upon the life of either party where disposal of such proceeds is provided by the terms of the insurance policy, or (d) social security benefits; or (e) the right of each of the parties to be free to make such testamentary disposition with respect to such party's separate property as such party elects, whether or not to the exclusion of the other.

"(10) Each of the parties shall be obligated to pay all property taxes properly chargeable to the property of such party. In the event of parties filing joint return for federal income tax purposes,

the party of the first part shall be chargeable with the payment of any tax imposed upon such filing.

"(11) In the event of divorce or legal separation, each of the parties waives all right to any award or share of the property of the other, and all alimony.

"(12) Each party agrees to pay his (or her) own debts, except while the marriage continues the party of the first part shall be liable for all debts or obligations with respect to which the laws of the jurisdiction where the parties reside impose upon a husband with respect to the support and maintenance of a wife.

"(13) This agreement and the rights of the parties thereunder shall be construed as a Michigan contract and the laws of that state shall govern in the interpretation thereof, regardless of the place of execution thereof, or of the subsequent residence of the parties.

"In witness whereof the parties have hereunto set their hands and seals this 29th day of May, 1963.

> "(s) *Charles Benker, L. S.*
> Party of the first part
>
> "(s) *Elizabeth Stewart, L. S.*
> Party of the second part

"State of Michigan

County of Wayne          SS:

"On this 29th day of May, 1963, before me, the subscriber, personally appeared Charles Benker, party of the first part in the foregoing agreement signed by him, and acknowledged the execution thereof to be his free act and deed.

> "*(s) Francis W. O'Neill*
> Notary Public
> Wayne County,
> Michigan

"My commission expires: 4/3/66

"State of Michigan

County of Wayne          SS:

"On this 29th day of May, 1963, before me, the subscriber, personally appeared Elizabeth Stewart, party of the second part in the foregoing agreement signed by her, and acknowledged the execution thereof to be her free act and deed.

> "*(s) Francis W. O'Neill*
> Notary Public
> Wayne County,
> Michigan

"My commission expires: 4/3/66"